## 12841

CAMPBELL v. LIFE & CASUALTY INS. CO. OF TENNESSEE
*ET AL.*

(152 S. E., 18)

 June, 1928. 

*Messrs. Benet, Shand & McGowan,* for appellants, 

*Messrs. E. J. Best, D. M. Winter,* and *G. Duncan Bellinger,* for respondent, 

February 20, 1930.

The opinion of the Court was delivered by MR. CHIEF JUSTICE WATTS.

This is a suit for slander instituted in the Court of Common Pleas for Richland County on February 24, 1928, and tried before Hon. W. H. Townsend and a jury on June 13, 14, 1928. The jury returned a verdict of $1,000 actual and $2,500 punitive damages against each of the defendants.

Subsequently by an order of Judge W. H. Townsend dated July 11, 1928, this verdict was modified so as to make the verdict for actual damages a joint verdict against the defendants in the sum of $1,000, and allowing the several verdicts for punitive damages of $2,500 against each defendant to remain as found by the jury.

From the judgment entered on this verdict the defendants appeal.

## EXCEPTIONS

1. His Honor erred, it is respectfully submitted, in refusing motion of the defendants for a nonsuit, the error being that the alleged slanderous language, to wit, that plaintiff "was $32.20 short in cash," "if you don't pay it I will turn it in to the bonding company and they will pay it," did not impute to the plaintiff the commission of a crime in that the testimony of the plaintiff, Campbell, and of the only two witnesses, Sloan and Lindsay, who claimed to have heard the statements, was to the effect that $30 of this amount was a surplus in the debit when Campbell took it over from a former agent, and was cash which had never been in the hands of Campbell but was simply in the account; and the plaintiff could not have been charged with unlawful and fraudulent conversion, a breach of trust with fraudulent intent and embezzlement in reference thereto; that the $2.20 was an amount due for excess arrears charged against the plaintiff and which was not a cash shortage, and there was no competent evidence that the bond of Campbell covered a criminal charge; so that the said language, given its reasonable and usual meaning and construed in the light of the facts and circumstances well known to all of the witnesses who claimed to have heard it, could not have been construed by them as a charge of a crime against the plaintiff, and a nonsuit was proper.

2. That his Honor erred in admitting over objection of the defendant's testimony of the witness Sloan as to the

condition of the bond of the plaintiff Campbell when the witness had admittedly never seen the Campbell bond, had nothing to do with Campbell in his connection with the company, the bond was not in evidence and the testimony of Sloan as to what the bonds of other agents covered, without any proof that the same condition appeared in the Campbell bond, was hearsay, incompetent, irrelevant, and highly prejudicial.

3. That his Honor erred in refusing motion for a directed verdict for the defendants on the ground that the alleged slanderous language used, read in the light of the facts and circumstances known and understood to all of the persons who heard such slanderous statement, and in the absence of any competent testimony as to the condition of the bond of the plaintiff Campbell, and whether the threat to report to the bonding company would of itself imply the charge of a crime, could not be construed as charging the said plaintiff with a crime as charged in the complaint, and was not, therefore, actionable.

The questions involved are:

1. Whether, in view of the testimony, the trial Judge erred in refusing the defendant's motions for a nonsuit and a directed verdict.

2. Whether or not his Honor erred in admitting over the defendant's objection the testimony of witness Sloan, whose duty it was to make reports to the bonding company in other cases of default under the bond, when the testimony of the witness was to the effect that his knowledge of why these reports were made, together with the language used, made the impression on him that the plaintiff was being charged with fraudulent misappropriation of funds and especially in view of the testimony of witness Lindsay at page 63, folios 249-254, and that of defendant Hair, page 126, folio 503.

The first exception charges error on the part of the trial Judge in refusing the defendant's motions for a nonsuit and

a directed verdict. By reference to the testimony of the plaintiff, Campbell, we find that the plaintiff testified that the defendants had charged him with being "short in cash." And the testimony of the other witnesses offered by the plaintiff was to the same effect; and the impression, as testified to by the witnesses, was that Campbell was being charged with a misappropriation of funds belonging to the company for which he worked, and that such misappropriation of funds, according to their impression, amounted to a breach of trust with fraudulent intent.

Our Court has without exception held that the alleged slanderous words used must be given their ordinary popular meaning, and if they are susceptible of two meanings, one slanderous and the other innocent, it must be left to the jury to determine from all of the circumstances attending the publication in what sense the defendant used them. *Eifert v. Sawyer,* 2 Nott & McC., 511, 10 Am. Dec., 633; *Jones v. Rivers,* 3 Brev., 95; *Davis v. Johnston,* 2 Bailey, 579; *Hugley v. Hugley,* 2 Bailey, 592; *Creiger v. Bunton,* 2 Rich., 395; *Morgan v. Livingston,* 2 Rich., 573; *Black v. State Co.,* 93 S. C., 475, 77 S. E., 51, Ann. Cas., 1914-C, 989; *Nunnamaker v. Smith,* 96 S. C., 299; 80 S. E., 465; *Duncan v. Record Publishing Co.,* 145 S. C., 264, 143 S. E., 31.

The defendant would not be entitled to a nonsuit unless there was no evidence on the part of the plaintiff to sustain any of the allegations of the complaint upon which he relied to make out the case of slander. There was sufficient evidence in the present case to establish the allegations of the complaint, and the weight of the evidence, or the sufficiency of it, was a question for the jury, and his Honor did not err in refusing defendant's motion for a nonsuit. For the defendant to be entitled to an order of nonsuit, there would have to appear a total absence of evidence to establish the material allegations of the complaint. *Munroe v. Williams,* 35 S. C., 572; 15 S. E., 279.

■■ On the motion made by the defendant for a directed verdict, the plaintiff was entitled to have the evidence construed most strongly in his favor. Questions of fact, when in dispute, as well as the inferences to be drawn from such facts after they have been determined, should be submitted to the jury for its determination, and the trial Judge cannot properly direct a verdict unless only one inference could reasonably be drawn from the facts and circumstances. *Taylor v. Winnsboro Mills,* 146 S. C., 28; 143 S. E., 474.

■■ We do not think that his Honor committed any error in admitting over objection the evidence of Sloan.

He (Sloan) was testifying of his own knowledge as to what the bond covered; and Hair, the agent of appellant, must have known or should have known what the bond covered, in checking up respondent's account. Hair charged that Campbell was short and threatened to report him to the bonding company. That was properly submitted to the jury, whether Hair meant Campbell was guilty of "personal dishonesty, forgery, theft, larceny, embezzlement, wrongful conversion, abstraction, and misapplication of funds." Some of these are essentially violations of the criminal law; others, not. It seems to be assumed by the plaintiff that the fact that the balance of the account due by him was to be demanded of the bonding company as a liability under the bond, necessarily implied that the plaintiff had committed a crime, and that, if he did not settle, the bonding company would institute criminal proceedings against him.

We see no error in any of the exceptions as complained of; all exceptions are overruled, and judgment affirmed.

MESSRS. JUSTICES BLEASE, STABLER, and CARTER concur.

MR. JUSTICE COTHRAN dissents.

MR. JUSTICE BLEASE (concurring) : It is my view that the Chief Justice is correct in the two holdings of his opinion: First, that there was plenty of evidence to require the trial Judge to send the case to the jury; and, second, that

there was no prejudicial error in the admission of the testimony of the witness Sloan.

I do not think it necessary to say anything as to the first holding, as the opinion of the Chief Justice fully covers that matter.

As to the second holding. The appellant's second exception is taken, as I view it, under a misapprehension of the rulings made by Judge Townsend. He did not hold that the witness could go into the contents of the bond in question. He did hold that the witness, who testified as to hearing the alleged slanderous language used by Hair to the plaintiff, could testify what the witness understood the words to mean. It was shown that the witness had been formerly employed by the appellant insurance company in the capacity of supervisor of agents of the class in which the plaintiff was included; that he was familiar with the manner in which the company conducted its business with the subordinate agents; that he knew the purpose for which the bonds of the agent were taken by the company and the purpose of making reports to the bonding company as to the conduct of agents, which purpose was to collect "cash shortages" due by agents for money collected by them and not remitted to the company. As Judge Townsend remarked in his rulings, the question before the trial Court was "whether or not this was a slanderous charge." The condition of the bond was, as the Judge stated, a collateral matter, and tended only to establish what construction should have been placed upon Hair's language.

MESSRS. JUSTICES STABLER and CARTER concur.

MR. JUSTICE COTHRAN (dissenting) : I think that the motion of the defendants for a directed verdict in their favor should have been granted upon the ground set forth in the opinion of the Chief Justice which needs not to be repeated. It is in substance that the alleged slanderous language *set forth in the complaint,* that the plaintiff "was $32.20 short in his cash" and "if you don't pay

it I will turn it in to the bonding company and they will pay it," did not impute to the plaintiff the commission of a crime, and was not therefore actionable without proof of special damages.

The testimony of the plaintiff and that of his witnesses Sloan and Lindsay shows that the plaintiff and the superintendent, Hair, were at cross-purposes in the conferences between them for the purpose of settling the accounts of the plaintiff who was retiring from the employment of the defendant company to take up work with another company

It appears that in a prior settlement with one Hurt, a predecessor of the plaintiff, an item appeared, not as a charge against Hurt, but as simply a memorandum of a balance of some $30 which had been paid to the company upon what was called the surplus account, or advanced payment account, made up of payments made by policyholders whose policies had lapsed, and were being held by the company until the payments accumulated to an amount sufficient to justify reinstatements of the policies. This, of course, could not be considered at a debit item against the predecessor Hurt or against the plaintiff, for it was in the hands of the company.

When the superintendent, Hair, balanced the account of the plaintiff preparatory to his leaving the company, he announced that the plaintiff was short in his cash $32.20. The plaintiff insisted that he was not short anything and that the apparent shortage was due to the fact that the debit item in Hurt's account of $30 had been erroneously carried into the statement of his account, and refused to account for the alleged balance of $32.20, though expressing willingness to account for $2.20, the balance after striking out the erroneous item of $30.

Hair made every effort to explain to the plaintiff that the balance of $32.20 was made up entirely of different items; that the Hurt item of $30 had not entered into the statement made up by him. The plaintiff would not be satisfied with

the explanation, and an angry dispute between them arose. It terminated with Hair's declaration, insisting upon payment, that if the plaintiff did not pay it he would make claim for it upon the company which had gone upon the plaintiff's bond when he was employed.

The plaintiff in his testimony to some extent amended the allegation of his complaint as to the statement made by Hair. He testified that Hair threatened to report the shortage to the bond company, "and the bonding company would collect it—*they would turn it over to the authorities*—he said he didn't give a damn whether I paid it or not, he would turn it into the bonding company and they would pay it."

Conceding, what I do not at all admit, that the plaintiff is entitled to recover upon a slanderous statement not alleged in the complaint, this amended statement constitutes the gravamen of the plaintiff's grievance.

The inference is entirely argumentative that when the shortage was reported to the bonding company and that company paid it, they would turn the matter over to the authorities for procedure under the criminal laws of South Carolina; that therefore the declaration contained an implication that the plaintiff had committed a breach of trust with fraudulent intent.

If the plaintiff was actually short in his accounts and the bonding company had to make it good, they would most probably attempt, at least, to obtain reimbursement from the plaintiff by such means as were available; that is, all that the statement if made could possibly mean. If as a matter of fact the plaintiff was *not* short in his account, the report of the matter to the bond company would doubtless have resulted in their ascertaining that fact and of course doing nothing.

To justify the inference that a report to the bond company would have resulted in a criminal prosecution, it necessarily must have appeared that *the bond covered only criminal conduct* on the part of the plaintiff. It is only upon that

assumption that it could possibly be argued that the Super-intendent meant to charge the plaintiff with a breach of trust with fraudulent intent.

It appears to me that the case of *Bell v. Clinton Oil Mill,* 129 S. C., 242; 124 S. E., 7, 9, is absolutely conclusive of the present issue. In that case the alleged slanderous statement of an officer of the company was this: "You might get word to Theo (referring to the plaintiff), that the company is going to place his account with the bonding company"—as the Court said: "manifestly meaning that the company intended to make a claim against the bonding company for the balance due by the plaintiff, as a liability under the bond." The Court further said:

"This is the slander of which the plaintiff complains, interpreted by him as a charge that the plaintiff had committed a breach of trust by appropriating to his own use money belonging to the company, and had thereby committed a crime against the laws of South Carolina; in other words, that he had committed a breach of trust with fraudulent intent. The language quoted does not upon its face impute to the plaintiff commission of a crime; it is therefore not actionable *per se.* If it can be construed as actionable, it must be by reason of extrinsic facts which taken in connection with the language used, disclose an intention on the part of the utterer to charge the plaintiff with having committed a crime.

"The bond indemnified the company from loss on account of certain specified acts of the employee: Personal dishonesty, forgery, theft, larceny, embezzlement, wrongful conversion, abstraction, and misapplication of funds. Some of these are essentially violations of the criminal law; others, not. It seems to be assumed by the plaintiff that the fact that the balance of the account due by him was to be demanded of the bonding company as a liability under the bond necessarily implied that the plaintiff had committed a crime, and that, if he did not settle, the bonding company

would institute criminal proceedings against him. There may have been some force in this assumption, if the bond had purported to indemnify the company *only* against loss sustained by the criminal conduct of the employee."

And further: "But if the bond covers deficits *free* from criminal intent, as well as those *with* such intent, a mere reference to the demand upon a bonding company for money due by the plaintiff furnishes no inference of an intention to charge the plaintiff with a crime."

The Court approved the following charge of the circuit Judge as clearly and accurately expressing the law: "I charge you, as a matter of law, that the assertion here that the plaintiff committed a breach of trust, having appropriated money to his own use, does not state a crime against the laws of South Carolina. A man may appropriate money to his own use without being guilty of a crime, or may commit a breach of trust without committing a crime. Breaches of trust are committed every day in the week, I reckon, and every week in the year, all over this country; but they do not necessarily constitute crimes, and the only way that that act could become a crime would be to do it with fraudulent intention. If a man commits a breach of trust with fraudulent intention, that is a crime; and if you charge a person with committing a breach of trust with fraudulent intention, then you charge him with a crime. But just to say that a man has committed a breach of trust, or that he has appropriated money to his own use, does not state a crime against the laws of this State. * * * There has been so much said about this bond that I charge you, as matter of law, that this bond covers other defaults and shortcomings, so to speak, of a person who is required to give it, besides those things which amount to a crime. The bond says it is given to reimburse the party to whom it is given against any act of personal dishonesty, forgery, theft, larceny, embezzlement, and wrongful conversion. Now, a man may be guilty of a wrongful conversion, and not be guilty of a crime.

So, if a man wrongfully converts money to his own use, and does it in such a way as not to subject himself to the charge of violating the criminal law, this bond would cover that abstraction or misapplication. If a man misapplies money where he should not, it would not necessarily follow that it is a crime; and this bond would cover that. So I charge you that this bond covers other shortcomings other than those things that are charged in here as crimes."

"Slanderous words to be actionable must impute the commission of a crime. 17 R. C. L., 263. Unless the article is libelous *per se,* no cause of action is stated since no special damages are alleged. *Kee v. Armstrong, Byrd & Co.,* 75 Okl., 84; 182 P. 494; 5 A. L. R., 1349.

The slanderous language proven here was not slanderous *per se.*

A charge that "his stock is short and his cash," made against a store manager, to his friend, by the superintendent who was then checking his accounts, does not necessarily impute the commission of a criminal offense. *Grand Union Tea Co. v. Lord* (C. C. A.), 231; F. 390, 395, Ann. Cas., 1918-C, 1118, where at page 1121 of Ann. Cas., 1918-C, the Court says: "It seems to us by no means certain that the language of Van Allen implied the commission of a crime, or was so understood by Moncure. The circumstances attending the utterance were such that Moncure might have inferred that no more was meant than a discovered variance between the amount of stock on hand and the amount that ought to be on hand according to the books. In other words, the shortage mentioned might have been understood to be merely a discrepancy, resulting from carelessness or unintentional error, which called upon Lord for explanation."

In *Bell v. Clinton Mill,* 129 S. C., 242; 124 S. E., 7, 11, the Court said: "It is apparent from the terms of the Statute that there may be a breach of trust, without a fraudulent

intention, which is not a crime under the Statute; and so it has been construed by this Court in numerous instances" —citing cases.

In determining whether words are actually slanderous, they must be given their usual and ordinary meaning, and must be construed in the light of the knowledge and information that the hearers had as to such meaning. 17 R. C. L., 313.

The hearers cannot attribute some unusual and sinister meaning which they knew or should have known was not intended. Campbell, Sloan, and Lindsay were all familiar with insurance accounting and knew what a surplus in a debit meant, and how it was made up. If, in fact, Hair said this shortage was made up of $30 cash surplus brought over from Hurt, and $2.20 excess arrearages and application fees, all of these parties knew that there could be no accusation of a criminal act in connection therewith. The law says they have no right to construe language to charge the commission of a crime which related to facts which could not constitute a crime, and which were capable of an innocent construction.

"It is rather the effect which the language complained of was fairly calculated to produce, and would naturally produce, upon the minds of readers of reasonable understanding, discretion, and candor, after it has been examined and considered in connection with all other parts of the writing, and in the light of all the facts and circumstances known to them." *Thompson v. Lewiston Daily Sun Pub. Co.,* 91 Me., 203; 39 A. 556, 557.

"In construing words charged to be slanderous everything said at the time and place should be considered together and given its natural and obvious meaning." *Nichols v. Daily Reporter Co.,* 30 Utah, 74; 83 P. 573; 3 L. R. A. (N. S.), 339; 116 Am. St. Rep., 807; 8 Ann Cas., 841.

"Words are to be construed by a court and jury in the same manner as they were or ought to be construed or

understood, by the person to whom they were spoken." *Eifert v. Sawyer,* 2 N. & McC., 511; 10 Am. Dec., 633; *Pegram v. Styron,* 1 Bailey, 595.

"In interpreting language complained of as slanderous, accompanying explanations and surrounding circumstances which were known at the time to the persons who heard the words uttered and which tend to modify their meaning may be taken into consideration, but attending circumstances which were unknown to the hearers cannot be considered." *Greer v. White,* 90 Ark., 117, 118 S. W., 258; 17 Ann. Cas., 270; 25 Cyc., 357; *Paxton v. Woodward,* 31 Mont., 195; 78 P. 215; 107 Am. St. Rep., 416.

The bond of the bond company is not set out in the transcript; it cannot be assumed that it covered only criminal acts of the plaintiff, upon which ground alone could it be argued that the alleged slanderous statement contained the implication of criminal conduct on the part of the plaintiff.

As to the second exception of the appellants, charging error in the admission of certain testimony of the witness Sloan in reference to the condition of the bond, I do not think that the testimony was prejudicial to the defendants; it was rather helpful. He testified:

"Well, I understood him to mean, when he said he was going to report it to the bonding company, and didn't care whether he would pay it or not, I would understand it was a cash shortage, *knowing the bond would be liable only for a cash shortage."* That the bond was *"to cover cash shortage."*

"Q. What is the purpose of making a report to the bonding company? A. It is to collect money—money from the bonding company—it is for the bonding company to pay this money that the agent has collected on the debit and has not remitted to the company."

I do not find in Sloan's testimony any evidence tending to show that the bond covered *only* criminal acts of the plain-

tiff, which alone could by any possibility form the basis of an implication of a criminal charge.

For these reasons I think that the judgment should be reversed, and the case remanded for judgment in favor of the defendants under Rule 27.